### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **AMANDA SMITH,** | * | |
| *Plaintiff,* | * | |
| **v.** | * | **Case No. 1:20-cv-00419-JRR** |
| **CHRISTINE WORMUTH,** | * | |
| *Defendant.* | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiff Amanda Smith filed this action against Defendant Christine Wormuth, Secretary of the Army, alleging violations of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.* (the "Rehabilitation Act"). (ECF No. 1.) Pending before the court is Plaintiff's Amended Motion for Summary Judgment (ECF No. 85; "Plaintiff's Motion"), Defendant's Cross Motion for Summary Judgment (ECF No. 88; "Defendant's Motion"), and Plaintiff's Motion for Reconsideration (ECF No. 95; the "Motion for Reconsideration"). The court has reviewed all papers. No hearing is necessary. Local Rule 105.6 (D. Md. 2023). For the reasons that follow, by accompanying order, Plaintiff's Motion will be denied, Defendant's Motion will be granted in part and denied in part, and Plaintiff's Motion for Reconsideration will be denied.

## I.     BACKGROUND

### A.  Factual Background

On May 21 2012, Plaintiff began working as a Program Analyst for Defendant's Army Testing and Evaluation Command ("ATEC") at Aberdeen Proving Ground in Aberdeen, Maryland. (ECF No. 88-3 at p. 2.) Plaintiff's chain of command included Barbara Monger as first-level supervisor, David Glenn as second-level supervisor, and Sandara Weaver as third-level

supervisor.  (ECF No. 88-3 at p. 2; ECF No. 88-6 at 28:5–14.)  Prior to her employment with ATEC, Plaintiff worked at the Army Research Engineering Department Command ("RDECOM"). (ECF No. 88-6 at 23:12–17.)  Plaintiff alleges that, since at least 2002, she has been diagnosed with post-traumatic stress disorder and anxiety with panic disorder.  (ECF No. 1 ¶ 1.)  Plaintiff testified that she informed Ms. Monger of her disabilities in July of 2012.  (ECF No. 88-6 at 79:19–80:8.)

1.  <u>Plaintiff's Relationship with Ms. Monger and Requests for Reassignment</u>

There is no dispute that Plaintiff and Ms. Monger had a "contentious" relationship.  (ECF No. 88-1 at p. 4; ECF No. 85 at p. 1.)  Plaintiff's complaints about Ms. Monger started shortly after she began her employment with ATEC.  Plaintiff alleges that Ms. Monger was irritated with her because she was returning to RDECOM in June 2012 to act as a witness in the investigation of another person's EEO complaint.  (ECF No. 88-6 at 33:1–13.)  Plaintiff informally complained about the way Ms. Monger talked to her on multiple occasions in 2012—to ATEC EEO Counselor Kelly Keck[1] in June 2012, to Mr. Glenn in July 2012, and to Ms. Weaver in August 2012.  (ECF No. 88-1 at p. 4–5; ECF No. 88-6 at 58–60, 66; ECF No. 88-8 at p. 5.)  Plaintiff did not file any contemporaneous formal complaints.  (ECF No. 88-6 at 58:9–59:16.)  In August of 2012, Ms. Weaver referred Plaintiff and Ms. Monger to mediation with Dr. Vicky Dixon to mediate their conflicts.  (ECF No. 88-8.)  During discovery in the present action, Plaintiff learned of an email Ms. Monger sent to Ms. Weaver on August 30, 2012, stating that she wanted to ask Plaintiff's former employer to "take her permanently."  (ECF No. 85 at p. 32–33.)

On April 29, 2013, Plaintiff arrived seven minutes late to work and missed a meeting.  (ECF No. 1 ¶ 30; ECF No. 88-7 at p. 3.)  Ms. Monger confronted Plaintiff about her tardiness.  Plaintiff

---

[1] Plaintiff and Mr. Keck appear to be family friends.  *See* ECF No. 85 at p. 6.

testifies that Ms. Monger was yelling at her, using a negative tone, and leaning over her. (ECF No. 88-6 at 96–97.) After the incident, Plaintiff had a panic attack. (ECF No. 85 at p. 1; ECF No. 88-7 at p. 3.) Plaintiff informed Mr. Glenn and left work to compose herself. (ECF No. 88-9.) Plaintiff and her husband then met Mr. Keck for lunch and discussed Plaintiff's concerns about Ms. Monger and the incident. *Id.* Mr. Keck advised Plaintiff on filing an EEO complaint about the purported hostile work environment. *Id.* When Plaintiff asked if she could be removed from Ms. Monger's supervision, Mr. Keck directed her to contact Human Resources, specifically Sharlene Lyle. *Id.* Later that day, Plaintiff sought medical attention at Patient First related to the panic attack. (ECF No. 88-9 at p. 3; ECF No. 88-10.) Plaintiff states that on April 29, 2013, she made a request to Ms. Lyle that she be reassigned from Ms. Monger's supervision. (ECF No. 85 at p. 2.) This accommodation was never granted.

After the incident of April 29, 2013, Plaintiff contends that Ms. Monger subjected her to "targeted micromanagement," which included increased face-to-face contact, checking in with Plaintiff daily, and coordinating her schedule with Plaintiff's schedule. *Id.* at p. 27–28. Further, Plaintiff contends that Ms. Monger included critical comments in Plaintiff's FY Annual Appraisal that was effective as of January 1, 2014. *Id.* at p. 26. In contrast, Plaintiff asserts that her Mid-Point Appraisal from April 22, 2013, showed that she performed above her expected level of contribution with no "negative performance noted." *Id.*

## 2. Plaintiff's 2013-2014 Leave and Termination

Plaintiff requested and took leave on April 30, 2013. (ECF No. 88-7.) That same day, Plaintiff alleges that she asked Mr. Glenn to be reassigned to another supervisor, indicating that she would even telework. (ECF No. 85 at p. 2.) This accommodation was never granted. Plaintiff proceeded to take intermittent leave in May 2013. (ECF No. 88-7 at p. 4.) Plaintiff was not

permitted to telework, and she was told to return her work computer to the ATEC Office.  (ECF No. 1 ¶ 54.)

On May 16, 2013, Plaintiff submitted an application with Civilian Personnel Advisory Center employee Kathy Davis to be a leave recipient under the Voluntary Leave Transfer Program ("VLTP").  (ECF No. 88-11.)  Plaintiff contends that Ms. Davis talked with Ms. Monger about the requirement that she sign Plaintiff's VLTP application on May 20, 2013.  (ECF No. 88-12.)  Plaintiff states that Ms. Monger, using Mr. Glenn as a conduit, requested additional medical records from Plaintiff to support her VLTP application.  *Id.*  Plaintiff told Mr. Glenn that CPAC already reviewed the information and that it was inappropriate to ask for her medical records.  *Id.*  That same day, Plaintiff went to Ms. Monger's office with Human Resources Directorate Terry Blanco to sign the form, which she left with Ms. Monger. *Id.*  Plaintiff's application was signed by Ms. Monger and approved on May 21, 2013.  (ECF No. 88-14.)

On or about May 20, 2013, Plaintiff invoked her entitlement to FMLA leave.  (ECF No. 88-15.)  Ms. Weaver contacted Plaintiff regarding her request on June 7, 2013.  *Id.*  Ms. Weaver told Plaintiff that the request was approved with a retroactive start date of May 20, 2013.  *Id.*  Ms. Weaver also approved Plaintiff's request for 80 hours of advanced sick leave to be taken before July 3, 2013.  *Id.*  Plaintiff was granted advanced sick leave from June 10 through June 21, 2013.  (ECF No. 1 ¶ 76.)  From June 7 through September 12, 2013, Plaintiff requested sick leave and leave without pay, which Ms. Weaver approved pursuant to her FMLA leave.  (ECF No. 88-15.)  On or about September 4, 2013, Plaintiff requested additional leave without pay to run from September 12, 2013 (the date that marked the end of her FMLA leave), through October 18, 2013.  *Id.*  Ms. Weaver continued to approve additional discretionary leave without pay until January 3,

2014.  *Id.*  On June 7, 2013, Plaintiff's badge access to the building was deactivated.  (ECF No. 85 at p. 29.)  Also in June 2013, Plaintiff's computer network account was deleted.  *Id.*

On or around December 30, 2013, Ms. Weaver advised Plaintiff that "due to mission requirements, (i.e., the importance and need to have someone performing the work and assignments historically assigned to [Plaintiff] in [her] position)," Ms. Weaver would no longer approve Plaintiff's requests for discretionary leave without pay.  (ECF No. 88-15.)  Ms. Weaver further informed Plaintiff that she would be placed on AWOL[2] status if there were further unauthorized absence after January 6, 2014.  *Id.*  Plaintiff requested reconsideration of this decision, and Ms. Weaver denied Plaintiff's requests on December 13, 2013, and January 17, 2014.  *Id.*  Plaintiff did not report to duty on January 6, 2014, and was designated AWOL until March 11, 2014.  *Id.*  Accordingly, on March 11, 2014, Ms. Weaver sent Plaintiff a Notice of Proposed Removal advising that she proposed to remove Plaintiff from her Program Analyst position due to Excessive AWOL.  *Id.*  The Notice advised Plaintiff that the removal would be effective no sooner than 30 days from receipt.  *Id.*  On April 14, 2014, Plaintiff submitted a reply to the Notice requesting that her removal be designated as due to "medical inability to perform her job" rather than Excessive AWOL.  (ECF No. 88-21.)  Defendant terminated Plaintiff on May 9, 2014, for the purported reason of Excessive AWOL.  (ECF No. 88-22; ECF No. 1 ¶ 1.)

### 3.  October 8, 2013 Accommodation Request

On October 8, 2013, Plaintiff submitted a formal Request for Reasonable Accommodation to Mr. Keck.  (ECF No. 88-19.)  The request stated that, following the incident on April 29, 2013, Plaintiff's anxiety and panic disorder became severely exacerbated.  *Id.*  Plaintiff stated that she was "unable to interact with [her] supervisor," and made the following requests for

---

[2] AWOL refers to being absent without leave authorization.

accommodations: reassignment to another supervisor; no interaction with her current supervisor; reassignment to a supervisor not directly involved in her "EEO case"; reassignment to a permanent position; designation of an ATEC medical officer to receive Plaintiff's medical documentation; use of the stairwells at the location of her new position. *Id.* Defendant contends that she denied Plaintiff's Request on January 28, 2014, based on Plaintiff's "inability to work in any capacity." (ECF No. 88-1 at p. 11.)

4.  Plaintiff's Claim with the Office of Workers' Comp Program ("OWCP")

While on FMLA Leave, Plaintiff filed a claim for "Occupational Disease," "indicating that [she] sustained an injury or medical condition on 4/29/2013 as a result of [her] employment." (ECF No. 88-18.)  The allegation concerned a hostile work environment resulting in anxiety and panic attacks. *Id.*  OWCP denied Plaintiff's request on November 27, 2013, and found that "the evidence was insufficient to establish that a medical condition arose during the course of [her] employment and within the scope of compensable work factors" under the Federal Employees' Compensation Act. *Id.*  Plaintiff requested reconsideration on January 7, 2014. *Id.*  Plaintiff alleges that Ms. Monger submitted inaccurate statements about Plaintiff's performance and work ethic to OWCP regarding Plaintiff's claim.  (ECF No. 85 at p. 32.)  On February 10, 2014, Mr. Glenn's letter to OWCP detailed his account of the April 29, 2013, incident, and indicated that both Plaintiff and Ms. Monger were "frustrated," "talk[ing] in an elevated tone," and that Plaintiff cried and reported to have a panic attack.  (ECF No. 88-7 at p. 3.)  On April 7, 2014, OWCP declined to modify its decision.  (ECF No. 88-18 at p. 2.)  During discovery in the present action, Plaintiff became aware of an email Ms. Monger sent to Ms. Weaver that referred to Plaintiff's OWCP application and called Plaintiff a "lying bitch."  (ECF No. 85 at p. 39.)

5.  Plaintiff's Formal Administrative Complaints

In total, Plaintiff made formal complaints in three separate administrative proceedings: EEO Complaint No. ARAPG13MAY01693 ("Claim 1693"), an appeal to the Merit Systems Protection Board ("MSPB") (the "MSPB appeal"), and EEO Complaint No. ARAPG15MAY01851 ("Claim 1851").  (ECF No. 88-24; ECF No. 88-25; ECF No. 10-2 at p. 52–57, 60–61.)

Claim 1693 was preceded by Plaintiff's initial contact with Defendant's EEO Office, specifically EEO Counselor Barbara Hagerich on May 28, 2013.  (ECF No. 88-24.)  During her intake interview on June 4, 2013, Plaintiff reported that she was discriminated against based on her disability and subjected to a hostile work environment from March 27, 2013, through May 21, 2013.  (ECF No. 88-24.)  Specifically, Plaintiff alleged that Ms. Monger disapproved her VLTP application and that her supervisor refused to reassign her to another division.  *Id.*  Plaintiff also detailed the alleged hostile work environment.  *Id.*  On July 12, 2013, Plaintiff filed the formal administrative complaint for Claim 1693, alleging that she was subjected to a hostile work environment, failure to accommodate in the form of reassignment to another supervisor, and reprisal in the form of delayed VLTP approval and sabotage of her OWCP claim.  (ECF No. 88-25.)  On September 9, 2013, Plaintiff amended Claim 1693 to allege that Ms. Monger made negative statements about Plaintiff's performance to OWCP to sabotage her OWCP claim.  (ECF No. 88-26.)  Subsequently, an EEO Fact-Finding Conference took place with Investigator Stephen Turner and an EEOC hearing was conducted before an Administrative Judge.  (ECF No. 88-27; ECF No. 10-2 at p. 13–41.)   The Administrative Judge's decision identified the issues raised in Claim 1693 as Defendant's denial of Plaintiff's "request for reassignment as a reasonable accommodation," Defendant's delay in Plaintiff's VLTP application, Defendant's sabotage of

Plaintiff's OWCP claim, and Ms. Monger's negative comments about Plaintiff's performance to OWCP.  (ECF No. 10-2 at p. 14.)  The Administrative Judge concluded that Plaintiff had "failed to establish that [Defendant] subjected her to discrimination or harassment on the bases of her disability or reprisal."  *Id.* at p. 41.  On November 19, 2019, EEOC's Office of Federal Operations affirmed its decision following Plaintiff's appeal.  *Id.* at p. 43–50.

Plaintiff filed the MSPB appeal on May 16, 2014, alleging that her removal was unlawful because ATEC failed to accommodate her, terminated her for excessive AWOL even though she provided medical documentation that her absence was due to a medical condition, denied her the right to take leave without pay for medical reasons, and treated medically-required absences as disciplinary offenses.  (ECF No. 10-2 at p. 57.)  Plaintiff then filed Claim 1851 with Defendant's EEO Office on June 20, 2014, alleging that ATEC failed to provide OPM with critical information regarding her retirement benefits as reprisal for her ongoing EEO complaint and deliberately sabotaged her OWCP application based on disability and/or reprisal.  *Id.* at p. 60–61.  Defendant contends that the EEO Office dismissed Plaintiff's OWCP claim as a "collateral attack."  (ECF No. 88-1 at p. 15.)  Plaintiff and Defendant subsequently entered a settlement agreement on August 15, 2016 (the "Settlement Agreement").  (ECF No. 10-2 at p. 63–66.)  The parties agree that the Settlement Agreement resolved the claims raised in the MSPB appeal and Claim 1851.  (ECF No. 88-1 at p. 16; ECF No. 85 at p. 42–43.)  In relevant part, the Settlement Agreement provides:

> To accept this agreement as settlement of her complaint before the Equal Employment Opportunity Commission . . . [Plaintiff] further agrees not to seek to reinstate her complaint or to otherwise attempt to challenge or litigate any matter at issue or reasonably arising therefrom in the complaint, in an administrative or judicial forum.

(ECF No. 10-2 at p. 64.)

**B. Procedural Background**

Plaintiff, *pro se* at the time, filed a complaint in this court on February 18, 2020.  (ECF No. 1; "the Complaint.")  In the Complaint, Plaintiff alleged that Defendant subjected her to disability discrimination in violation of the Rehabilitation Act (Count I); failure to accommodate in violation of the Rehabilitation Act (Count II); interference in violation of the Rehabilitation Act (Count III); retaliation in violation of the Rehabilitation Act (Count IV); and violation of the confidentiality provisions of the Rehabilitation Act (Count V).  *Id.*  On January 4, 2021, Defendant moved to dismiss the complaint or, in the alternative, for summary judgment.  (ECF No. 10.)  On September 3, 2021, the court granted the motion in part by dismissing Plaintiff's hostile work environment claims in Counts I and IV, and Count V, and denied the motion in all other respects.  (ECF Nos. 21, 22.)  Plaintiff filed a motion for reconsideration of the court's order on November 12, 2021, which the court denied.  (ECF Nos. 45, 49, 50.)  As a result, at the time of the filing of the present motions, the claims at issue are Counts I through IV absent previously dismissed hostile work environment claims.

On June 23, 2023, Plaintiff, represented by counsel, filed the Amended Motion for Summary Judgment. (ECF No. 85.)[3]  Defendant, in turn, filed her Cross Motion for Summary Judgment (ECF No. 88) on July 31, 2023.  Both parties filed responses in opposition to the respective motions.  (ECF Nos. 94, 99.)  In the midst of the briefing schedule on the cross motions, Plaintiff filed the Motion for Reconsideration (ECF No. 95) on September 27, 2023, asking the court to reconsider its September 3, 2021, decision dismissing Plaintiff's hostile work environment

---

[3] On May 30, 2023, Plaintiff filed a motion for summary judgment totaling 30 pages with an attached 38-page statement of undisputed material facts. (ECF Nos. 80, 80-1.)  Defendant moved to strike Plaintiff's briefing for failure to comply with Local Rule 105.  (ECF No. 81.)  Shortly thereafter, Plaintiff filed a consent motion to adjust the summary judgment briefing schedule to allow her to file an amended summary judgment motion (ECF No. 82) and a consent motion to exceed the briefing page limit.  (ECF No. 84.)  The court granted both consent motions (ECF Nos. 83, 86), and denied Defendant's motion to strike as moot.  (ECF No. 87.)

claims.  Defendant opposed the Motion for Reconsideration; and Plaintiff replied.  (ECF Nos. 100, 103.)

## II.     Plaintiff's Motion for Reconsideration

Due to its impact on the pending cross motions for summary judgment, the court first addresses Plaintiff's Motion for Reconsideration.  Plaintiff titled her Motion for Reconsideration: "Plaintiff's Motion for Reconsideration of the Dismissal of Hostile Work Environment Claim, Amend Add Claim for Tampering and Sanction."  (ECF No. 95.)  The Motion for Reconsideration is plainly untimely.  A motion to reconsider must be filed within fourteen (14) days of entry of the court's order.  Local Rule 105.10 (D. Md. 2023).  Plaintiff filed this second reconsideration motion more than two years after the challenged court order, and more than a year and a half after the court order denying her first motion for reconsideration.  (ECF Nos. 21, 22, 49, 50, 95.)  A delay of this magnitude warrants denial.[4]

Although a motion for reconsideration is not the proper vehicle for such a request, the court also finds the Motion for Reconsideration to be untimely to the extent it seeks a spoliation sanction against Defendant in the form of reinstituting Plaintiff's hostile work environment claims.  This result is compelled by the very caselaw upon which Plaintiff herself relies.  (ECF No. 95 at p. 4.)  In *Goodman v. Praxair Services, Inc.*, this court explained:

> Fed. R. Civ. P. 37 governs most motions for discovery sanctions, but it does not contain any specific reference to the timing of the filing of a motion seeking spoliation sanctions.  Courts considering

---

[4] Plaintiff asserts in her reply brief that the Motion for Reconsideration was filed "under Rule 60(b)(6) and 60(d)." (ECF No. 103 at p. 1.)  This statement is, at best, the product of willful ignorance, and, at worst, a blatant falsehood. To begin, Plaintiff identified the applicable legal standards in her brief as Rule 54(b), Rule 37, and the court's "inherent authority to impose sanctions for spoliation based on its inherent authority to control the judicial process." (ECF No. 95 at p. 3–4.)  In her reply, she shifts gears and asserts that the court should look to Rule 60(b)(6) and 60(d), "which [are] not clearly defined on timing," (ECF No. 103 at p. 8), despite the fact that her asserted basis for relief is "newly discovery evidence."  "[N]ewly discovered evidence" as a basis for Rule 60 relief expressly falls under Rule 60(b)(2), which is restricted by Rule 60(c)(1)'s one year deadline.  Under any construct, the Motion for Reconsideration is extraordinarily untimely.  FED. R. CIV. P. 60(c)(1).

this issue have identified a number of factors that can be used to assess the timeliness of spoliation motions. First, [k]ey to the discretionary timeliness assessment of lower courts is how long after the close of discovery the relevant spoliation motion has been made . . . . Second, a court should examine the temporal proximity between a spoliation motion and motions for summary judgment. Third, courts should be wary of any spoliation motion made on the eve of trial. Fourth, courts should consider whether there was any governing deadline for filing spoliation motions in the scheduling order issued pursuant to Fed. R. Civ. P. 16(b) or by local rule. Finally, the explanation of the moving party as to why the motion was not filed earlier should be considered.

632 F. Supp. 2d 494, 506–508 (D. Md. 2009) (citing cases) (citations and footnote omitted). The *Goodman* court also noted, "[c]ourts are justifiably unsympathetic to litigants who, because of inattention, neglect, or purposeful delay aimed at achieving an unwarranted tactical advantage, attempt to reargue a substantive issue already ruled on by the court through the guise of a spoliation motion." *Id.* at 508.

Plaintiff filed her Motion for Reconsideration almost a year after the close of discovery and almost four months after her original motion for summary judgment.[5] (ECF No. 67.) Plaintiff made no effort to confer with Defendant prior to filing in contrast to the requirements of Rule 37(a) and Local Rule 104.7. Plaintiff further failed to comply with this court's order regarding discovery. (ECF No. 56.) And finally, Plaintiff's purported explanation for the delay is merely that counsel needed time to review the discovery information despite the fact that some of the issues raised were known to Plaintiff prior to the filing of this lawsuit.[6] (ECF No. 103 at p. 1; ECF No. 100 at p. 2.) Considering the *Goodman* factors, and that Plaintiff's request is, by the very

---

[5] The parties agreed to a limited extension of the discovery deadline to February 28, 2023, for the sole purpose of conducting additional depositions. (ECF No. 73.)

[6] Moreover, Plaintiff asserts that Defendant failed to preserve her email, which failure warrants sanctions. (ECF No. 95 at p. 11–13). Plaintiff, however, also states that she received access to her emails in discovery. *See* ECF No. 85 at p. 5 ("Ms. Smith's emails were later recovered . . . and provided to Ms. Smith in discovery.").

relief requested, an attempt to reargue a substantive issue ruled on by this court over two years ago, the court concludes that Plaintiff's request for spoliation sanctions in the form of reinstituting Plaintiff's hostile work environment claims is untimely and will be denied.

## III.   <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id*. at 249.  Courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).  If the moving party demonstrates "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmoving party to "present specific facts showing that there is a genuine issue for trial." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015).   "To create a genuine issue for trial, 'the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.'"  *Id.* (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).  "In other words, a factual dispute is genuine only where 'the non-

movant's version is supported by sufficient evidence to permit a reasonable jury to find' in its

favor." *Id.* (quoting *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 175 (4th Cir. 1988)).

In undertaking this inquiry, the court considers the facts and all reasonable inferences in

the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see

also Scott v. Harris*, 550 U.S. 372, 378 (2007). The court "must not weigh evidence or make

credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir.

2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also

Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the

trial court may not make credibility determinations at the summary judgment stage). "When faced

with cross-motions for summary judgment, the court must review each motion separately on its

own merits to determine whether either of the parties deserves judgment as a matter of

law . . . . [And] the court must take care to resolve all factual disputes and any competing, rational

inferences in the light most favorable to the party opposing that motion." *Rossignol v. Voorhaar*,

316 F.3d 516, 523 (4th Cir. 2003) (citations omitted). *See Feinberg v. T. Rowe Price Grp., Inc.*,

No. CV JKB-17-427, 2021 WL 488631, at \*5 (D. Md. Feb. 10, 2021) ("When both parties file

motions for summary judgment, the Court evaluates each party's motion on an individual and

separate basis, determining, in each case, whether a judgment may be entered in accordance with

the Rule 56 standard." (citations omitted)).

## IV.  <u>ANALYSIS</u>

### A.  **Plaintiff's Motion**

Plaintiff contends that she is entitled to judgment as a matter of law on all claims in the

Complaint. (ECF No. 85 at p. i.) The court disagrees. Plaintiff's Motion lacks the foundational

legal analysis necessary to prove her claims as a matter of law and amounts instead to a plethora

of facts that she throws at the proverbial wall to see what sticks.  By way of example, with regard to her disability discrimination and failure to accommodate claims, Plaintiff makes no legal argument with respect to her status as a qualified individual under the Rehabilitation Act or that her request for accommodation was reasonable.  (ECF No. 85 at p. 9–17.)  The respective subsections contain no citation to law.  *Id.* at p. 9–12.  Further, Plaintiff's argument that she is entitled to judgment as a matter of law on her claims for interference and retaliation lacks a single citation to law, and instead presents a near 20-page recitation of factual allegations, some of which are unsupported by record reference, as required.  *See* ECF No. 85 at p. 18–37; Fed. R. Civ. P. 56(c)(1)(A).

Plaintiff has therefore failed to meet her burden to demonstrate that there are no genuine disputes of material fact or that she is entitled to judgment as a matter of law on all of her claims. It is not the court's role or responsibility, nor is it within the court's authority, to make legal arguments for her.  *See Garrett v. Selby Connor Maddux & Janer,* 425 F.3d 836, 840 (10th Cir. 2005) (noting that "the court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record."); *Tyler v. Runyon*, 70 F.3d 458, 466 (7th Cir. 1995) (providing that the "court has no duty to research and construct legal arguments available to a party, especially when he is represented by counsel." (citations omitted)); *Hall v. Gestamp W. Virginia, LLC*, No. 2:20-CV-00146, 2021 WL 3552222, at *4 (S.D.W. Va. Aug. 11, 2021) (concluding that where the "plaintiff has not attempted to make that showing" by evidence and argument of the disability element of her prima facie case, "the court could not do the legwork for her"); *Priester v. Futuramic Tool & Eng'g Co.*, No. 2:14-CV-01108-DCN, 2017 WL 1135134, at *10 n.11 (D.S.C. Mar. 27, 2017) (explaining that the court "cannot—nor should it have to—make [a party's] arguments for it."); *Jiangmen Kinwai Furniture Decoration Co. v. IHFC Properties,*

*LLC*, No. 1:14-CV-689, 2015 WL 5098791, at *9 n.9 (M.D.N.C. Aug. 31, 2015) ("Nor does the Court have a duty to conduct legal research to support or refute a party's unsupported legal argument."); *Minemyer v. B–Roc Representatives, Inc.*, 695 F. Supp. 2d 797, 809 (N.D. Ill. 2009) ("[T]his is an adversarial system. It is not a court's task to research legal arguments on a party's behalf."). Accordingly, Plaintiff's Motion will be denied.

### B. Defendant's Motion

Defendant argues that she is entitled to judgment as a matter of law on all of Plaintiff's claims and contends that some allegations that Plaintiff relies on to support her claims for relief were not administratively exhausted and were released by the parties' Settlement Agreement. (ECF No. 88-1.)

#### 1. Claims Not Administratively Exhausted

Defendant first argues that the court lacks jurisdiction over certain of Plaintiff's claims because they were not exhausted at the administrative level. (ECF No. 88-1 at p. 18.) The specific claims at issue include: negative performance appraisals by Ms. Monger; Plaintiff's theory that ATEC interfered with her rights under the Rehabilitation Act; denials of reasonable accommodation requests prior to April 29, 2013; and Plaintiff's claim that Ms. Monger retaliated against her for her participation in a former coworker's EEO claim investigation.[7] *Id.* Defendant previously sought to dismiss some of the aforementioned claims, and this court rejected that

---

[7] Defendant also contends that Plaintiff's claims she was placed on leave without pay, was suspended, was transferred to a different position, and was constructively demoted were not administratively exhausted. (ECF No. 88-1 at p. 18.) With respect to Plaintiff being placed on leave without pay, it is unclear where Plaintiff argues that she was discriminated against or retaliated against by being placed on leave without pay. To the extent Plaintiff raises a claim that Defendant discriminated or retaliated against her by denying her leave without pay, that claim would be subject to the Settlement Agreement discussed *infra*. Further, Plaintiff's response makes clear that she is not relying on allegations related to suspension, transfer, or constructive demotion to support her claims. (ECF No. 94-1 at p. 13) ("Claims of an alleged suspension, transfer, and constructive demotion are ***not*** part of Ms. Smith's case and are not included in [her summary judgment motion].").

argument, finding that "the allegations in the suit are reasonably related to her prior complaints." (ECF No. 21 at p. 33.)

As an initial matter, Defendant incorrectly states that lack of administrative exhaustion acts as a bar to the court's subject matter jurisdiction.  (ECF No. 88-1 at p. 18–19.)  Indeed, as this court explained in its previous order: "[T]he Supreme Court has said that a plaintiff's failure to exhaust administrative remedies does not necessarily divest the court of subject matter jurisdiction. Rather, exhaustion is a 'claim-processing rule,' which is 'mandatory' in the sense that a court must enforce the rule if a party 'properly raises it.'"  ECF No. 21 (citing *Fort Bend County v. Davis*, 587 U.S. ——, 139 S. Ct. 1843 (2019)).

"Federal employees 'who believe they have been discriminated against on the basis of . . . disability . . . must consult [an EEO] Counselor [in the employee's federal agency] prior to filing [an agency EEO] complaint in order to try to informally resolve the matter.'"  *Grady v. McCarthy*, No. CV ELH-17-1141, 2018 WL 3105769, at *9 (D. Md. June 22, 2018) (quoting 29 C.F.R. § 1614.105(a)).  Employees must exhaust their administrative remedy by "initiat[ing] contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory." *Id.* (quoting 29 C.F.R. § 1614.105(a)(1)).  "Rehabilitation Act claims against the federal government . . . comply with the same administrative procedures that govern federal employee Title VII claims."  *Wilkinson v. Rumsfeld*, 100 F. App'x 155, 157 (4th Cir. 2004) (citing *Doe v. Garrett,* 903 F.2d 1455, 1460–61 (11th Cir. 1990)).  Accordingly, a plaintiff must first exhaust her administrative remedies before she may assert a claim under the Rehabilitation Act in federal court. *Id.*  "Requiring exhaustion of administrative remedies serves twin objectives: protecting agency authority in the administrative process and 'promot[ing] efficiency' in the resolution of claims. *Stewart v. Iancu*, 912 F.3d 693, 699 (4th Cir. 2019) (*Woodford v. Ngo*, 548 U.S. 81, 89 (2006)).

16

"[E]xhaustion requirements ensure that agencies are provided the first opportunity to 'exercise [ ] discretion' or 'apply [ ] expertise.' *Id.* (quoting *McKart v. United States*, 395 U.S. 185, 193–94 (1969)). "The filing of an administrative charge is not simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005). It "serves a vital function in the process of remedying an unlawful employment practice." *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013).

In determining whether a plaintiff has exhausted her claims, the court should look to claims raised in the administrative complaint, as well as claims "that would naturally have arisen from an investigation thereof." *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 306 (4th Cir. 2019) (quoting *Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995)). However, "when the claims in her court complaint are broader than 'the allegation of a discrete act or acts in [the] administrative [complaint]', they are procedurally barred." *Id.* (quoting *Chacko*, 429 F. 3d at 508–10)). Generally, "a plaintiff fails to exhaust [her] administrative remedies where . . . [her] administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in [her] formal suit." *Chacko*, 429 F.3d at 506. In *Walton v. Harker*, 33 F.4th 165 (4th Cir. 2022), the Fourth Circuit succinctly explained:

> A plaintiff's EEOC charge defines the scope of her subsequent right to institute a civil suit. The allegations contained in the administrative charge of discrimination generally limit the scope of any subsequent judicial complaint. [F]actual allegations made in formal litigation must correspond to those set forth in the administrative charge. Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII [or ADEA] lawsuit.

*Id.* at 172 (citations omitted). The court also recognizes that administrative charges "often are not completed by lawyers and as such 'must be construed with utmost liberality.'" *Balas*, 711 F.3d at

408 (quoting *Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*, 848 F.2d 457, 460 (4th Cir. 1988)). The court, however, is not "at liberty to read into administrative charges allegations they do not contain." *Id.*

Particularly relevant here, Plaintiff made contact with EEO Counselor Hagerich on May 28, 2013, before subsequently filing a formal administrative complaint (Claim 1693) on July 12, 2013. (ECF Nos. 88-24, 88-25.) Plaintiff alleged that she was subject to disability discrimination and a hostile work environment from March 27, 2013, to May 21, 2023 by Ms. Monger when she disapproved her request for donation to the VLTP and her supervisor refused to reassign her to another division. *Id.* The court concludes that the allegations by Plaintiff of negative performance appraisals, interference with her rights, delay in the VLTP approval, and retaliation due to her participation in the June 2012 RDECOM EEO complaint are all administratively exhausted because the allegations are sufficiently related to the Complaint, such that they would "naturally have arisen from an investigation" of Plaintiff's EEO complaints to Defendant. *See Parker v. Reema Consulting Servs., Inc.*, 915 F.3d at 306, *supra*. Particularly, with respect to interference, Defendant's broad argument neglects the purported facts and actions that may underlie an interference claim, some of which could have been exhausted. *See* ECF No. 85 at p. 18–37.

Conversely, any denial of request for reasonable accommodation that occurred more than 45 days prior to Plaintiff's initial contact with the EEO Counselor on May 28, 2013, are barred because Plaintiff failed to exhaust her administrative remedies. *See Hill v. Hampstead Lester Morton Court Partners LP*, 581 F. App'x 178, 180–81 (4th Cir. 2014) (holding that "defendant's failure to accommodate constitutes a discrete act rather than an ongoing omission."). The court also finds that Plaintiff's allegation that she was denied telework as a reasonable accommodation was not exhausted and is therefore procedurally barred. While the content could in theory have

arisen from the same investigation, as discussed *supra*, the record makes apparent that denial of telework was not investigated: reference to a telework accommodation request is noticeably absent from the EEO counselor's record, the witness interviews, and the hearing before the administrative judge.  (ECF Nos. 88-24, 88-25, 88-26, 88-27, 10-2.)  The fact that Plaintiff characterized her accommodation request to Mr. Glenn as one for reassignment hardens this conclusion.  (ECF No. 88-25.)  Against this backdrop, the court cannot conclude that alleged denial of Plaintiff's request to telework was administrative exhausted.

The court will thus consider the exhausted claims referenced above in reviewing Defendant's Motion.

### 2.  Claims Subject to the Settlement Agreement

The parties appear to agree that the Settlement Agreement applies to claims raised in Plaintiff's MSPB appeal and Claim 1851.  (ECF No. 85 at p. 42–43; ECF No. 88-1 at p. 25.)  The Settlement Agreement provides in relevant part:

> To accept this agreement as settlement of her complaint before the Equal Employment Opportunity Commission . . . [Plaintiff] further agrees not to seek to reinstate her complaint or to otherwise attempt to challenge or litigate any matter at issue or reasonably arising therefrom in the complaint, in an administrative or judicial forum.

(ECF No. 10-2 at p. 64).  As previously discussed, the MSPB appeal concerned Plaintiff's allegations that Defendant failed to accommodate her, that Defendant terminated her for excessive AWOL despite her medical documentation, that ATEC denied her leave without pay for medical reasons, and that ATEC refused to cite medical cause as the cause of her termination.  (ECF No. 10-2 at p. 57.)  Claim 1851 concerned Defendant's refusal to cooperate with the Office of Management and Budget with respect to Plaintiff's retirement and Defendant's interference with her pending OWCP claim (which was dismissed as a collateral attack).

As it is undisputed that the Settlement Agreement is effective and binding, its plain terms prohibit Plaintiff from relying on claims within its four corners to recover in the instant action. This limitation does not bar Plaintiff's claim for interference with her OWCP claim, which was dismissed from Claim 1851 as a collateral attack.

### 3. Rehabilitation Act Claims

"The Rehabilitation Act prohibits federal agencies from discriminating against its employees on the basis of disability." *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); 29 U.S.C. § 794(a). "The Rehabilitation Act incorporates by reference the 'remedies, procedures, and rights' established by Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d, *et seq.*), which prohibits discrimination on the basis of race, color, or national origin by recipients of federal financial assistance." *Prosa v. Austin*, No. CV ELH-20-3015, 2022 WL 394465, at \*26 (D. Md. Feb. 8, 2022) (citing 29 U.S.C. § 794a(a)(2)). It is also closely related to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq. Id.* Accordingly, "to the extent possible, [courts] construe similar provisions in the two statutes consistently." *Id.* (quoting *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 214 (4th Cir. 2002)). *See Seremeth v. Board of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 336 n.1 (4th Cir. 2012) (instructing that "[c]laims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is substantially the same." (citation omitted)). The "standards used to determine whether an employer has discriminated under the Rehabilitation Act are" those that apply to the ADA. *Hooven-Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001).

### a. Count I: Disability Discrimination in Violation of the Rehabilitation Act

To prove a claim of disability discrimination under the Rehabilitation Act, Plaintiff must demonstrate that "(1) she is disabled; (2) she was otherwise qualified for the position; and (3) she

suffered an adverse employment action solely on the basis of her disability." *Hannah P.*, 916 F.3d at 342; *see also Perry v. Computer Scis. Corp.*, 429 F. App'x 218, 220 (4th Cir. 2011) (same). While the ADA and the Rehabilitation Act are generally "construed to impose the same requirements," the causation standard under the Rehabilitation Act is "significantly dissimilar" from the ADA in that it requires a plaintiff prove the adverse action was taken solely on the basis of her disability. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 n.17 (4th Cir. 2005).

Where, as here, Plaintiff lacks direct evidence of discrimination, her claim for disability discrimination is subject to the *McDonnell Douglas* burden-shifting framework. *Hannah P.*, 916 F.3d at 342; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). After Plaintiff meets her burden to show that she was a qualified person with a disability who suffered an adverse employment action solely on the basis of her disability, the burden then shifts to Defendant to provide a "legitimate, nondiscriminatory reason for its conduct." *Hannah P.*, 916 F.3d at 342. "'[T]he defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254–55 (1981)). If Defendant does so, the burden shifts back to Plaintiff to show by a preponderance of the evidence that Defendant's proffered legitimate, nondiscriminatory reason for her conduct was a mere pretext for discrimination. *Hannah P.*, 916 F.3d at 342.

In *Mitchell v. Data General Corporation*, the Fourth Circuit noted that "[w]hile the proof scheme in a discrimination case can make the summary judgment analysis somewhat trickier, a defendant can still obtain a summary judgment in one of two ways." 12 F.3d 1310, 1316 (4th Cir.

1993).  A defendant "can demonstrate that the plaintiff's proffered evidence fails to establish a prima facie case, or, if it does, the defendant can present evidence that provides a legitimate nondiscriminatory explanation about which the plaintiff does not create a factual dispute." *Id.*; *see Henson v. Liggett Group, Inc.*, 61 F.3d 270, 274 (4th Cir. 1995) (explaining that "[a]n employer is entitled to summary judgment if the plaintiff fails to establish a prima facie case of discrimination or fails to raise a factual dispute regarding the employer's proffered reasons for the alleged discriminatory act").  "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *E.E.O.C. v. Clay Printing Co.*, 955 F.2d 936, 943 (4th Cir. 1992)).

With respect to Plaintiff's disability discrimination claim under the Rehabilitation Act, Defendant does not challenge that she is a person with a disability; instead, Defendant focuses on the other elements, contending that Plaintiff was not qualified because she was incapacitated to work, that Plaintiff's allegations do not constitute adverse actions, and that Plaintiff fails to show the requisite causal link between her disability and the alleged adverse actions.  (ECF No. 88-1 at p. 26–33.)  Failure to prove any of these elements requires summary judgment for Defendant.  *See Mitchell*, 12 F.3d at 1316, *supra*.

Plaintiff bases her claim of disability discrimination on Defendant's denial of reasonable accommodation requests made on April 29, 2013 and May 2, 2013.[8]  (ECF No. 85 at p. 11.)  The denial of these accommodation requests, even if adverse, cannot independently sustain a claim for disability discrimination under the Rehabilitation Act.  This court's decision in *Leckie v. Board of*

---

[8] Plaintiff makes a cursory reference in her Motion that, in her June 4, 2013, intake interview with the EEO Counselor, she stated her preferred accommodation was reassignment "but would consider any accommodation."  (ECF No. 85 at p. 23.)  Plaintiff provides no record citation in support of this assertion; nor is it reflected in the June 4, 2013, intake notes.  (ECF No. 88-24.)

*Education of Montgomery County* is instructive.  No. CV TDC-23-0299, 2023 WL 8809310 (D.

Md. Dec. 19, 2023).  There, the court explained:

> To the extent that [the plaintiff's] retaliation claim is based on the premise that the denials of her requests for reasonable accommodations were themselves materially adverse actions, the Court finds that they were not.  Other judges in this District have held that the denial of a request for a reasonable accommodation, on its own, cannot constitute a materially adverse action under *Burlington Northern* [*& Santa Fe Railway Co. v. White*] sufficient to sustain a retaliation claim.
>
> In reaching this conclusion, courts have reasoned that if the denial of a request for accommodation could itself support a claim of retaliation based on the request, then every failure-to-accommodate claim would be doubled.
>
> The Court agrees that allowing a retaliation claim in which the denial of a request for a reasonable accommodation is the materially adverse action would effectively duplicate the failure-to-accommodate claim.

*Id.* at *7–8 (citations omitted).  *See Johnson v. Maryland Transit Administration*, No. CV CCB-

19-2523, 2021 WL 809768, at *5 (D. Md. Mar. 2, 2021) (holding that "mere denial of a request

for a reasonable accommodation cannot be an adverse employment action giving rise to a separate

ADA retaliation claim lest every time an employee was denied a requested accommodation, he

would be able to 'double dip' by asserting both the ADA failure-to-accommodate and ADA

retaliation claims."  (citations omitted)).  While the *Leckie* and *Johnson* decisions concern

retaliation claims, as opposed to disability discrimination claims, their analyses are applicable here.

Plaintiff bases her disability discrimination claim entirely on Defendant's denial of

accommodation requests; and on that basis, she asserts a separate failure to accommodate claim.

*See* ECF No. 85 at p. 11–12 (stating her argument for entitlement to relief on her disability

discrimination claim was based on Defendant having "refused to consider any accommodation").

As the court reasoned in *Leckie*, "if the denial of a request for accommodation could itself support

Case 1:20-cv-00419-JRR   Document 104   Filed 03/08/24   Page 24 of 31

a claim" of disability discrimination, "every failure-to-accommodate claim would be doubled." *See Leckie*, 2023 WL 8809310 at *8, *supra*. Therefore Plaintiff's allegation that Defendant denied her requests for reasonable accommodation cannot, without more, sustain Plaintiff's disability discrimination claim. Plaintiff's Motion identifies no other adverse actions to support her claim of disability discrimination; therefore, she fails to generate a dispute of material fact.[9] Defendant is entitled to judgment as a matter of law on Plaintiff's claim for disability discrimination in violation of the Rehabilitation Act.[10]

> b. Count II: Failure to Accommodate in Violation of the Rehabilitation Act

"To establish a prima facie claim of failure to accommodate under the Rehabilitation Act, a plaintiff must demonstrate that (1) she was a qualified person with a disability; (2) the employer had notice of the disability; (3) the plaintiff could perform the essential functions of the position with a reasonable accommodation; and (4) the employer nonetheless refused to make the accommodation." *Hannah P.*, 916 F.3d at 337. "Implicit in the third element is a requirement that [the] proposed accommodation[ ] [be] reasonable." *Stewart v. Ross*, No. 116CV213LMBJFA, 2020 WL 1907471, at *10 (E.D. Va. Apr. 17, 2020), *aff'd*, 833 F. App'x 995 (4th Cir. 2021) (quoting *Reyazuddin v. Montgomery Cty. Md.*, 789 F.3d 407, 414 (4th Cir. 2015)).

Other courts in this circuit have concluded that a request for a different supervisor is, on its own, not a reasonable accommodation as a matter of law. For instance, the Eastern District of Virginia court in *Stewart v. Ross* explained that "the great majority of courts . . . have held that employers are not required to provide an employee with a different supervisor as an

---

[9] Plaintiff's Motion clearly identifies the failure to accommodate as the basis of her disability claim. (ECF No. 85 at p. 11–12; ECF No. 94-1 at p. 2–3.) Regardless, even to the extent Plaintiff intended to rely, or contends she does rely, on other adverse actions, the court would similarly reject her argument. *See infra* Section IV.B.3(d).

[10] Even if the court were to conclude that the denial accommodation requests constituted adverse actions to support a claim for disability discrimination, Plaintiff offers no argument that denial of such accommodation requests, specifically by Ms. Lyle, Mr. Glenn, and Mr. Keck, were made solely on the basis of her disability. *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); 29 U.S.C. § 794(a).

accommodation because a different supervisor does not constitute a reasonable accommodation as a matter of law." 2020 WL 1907471, at *13 (citations omitted). *See, e.g.*, *Adinolfi v. N. Carolina Dep't of Just.*, No. 5:18-CV-539-FL, 2022 WL 956330, at *17 (E.D.N.C. Feb. 25, 2022), *aff'd*, No. 22-1329, 2023 WL 1814206 (4th Cir. Feb. 8, 2023) ("Here, where plaintiff's request [was triggered] by the presence of Dismukes and Elder as supervisors . . . , reassignment on that basis was not reasonable.  The law does not require employers to construct preferential accommodations that maximize workplace opportunities for their disabled employees." (citations omitted)); *Roby v. Walsh*, No. 5:21-CV-00505, 2022 WL 2824669, at *19 (S.D.W. Va. Mar. 22, 2022), *report and recommendation adopted sub nom.*, 2022 WL 2818959 (S.D.W. Va. July 19, 2022) ("Plaintiff's request – to essentially avoid all contact with his immediate supervisor – is facially unreasonable."); *Wigger v. CVS Pharmacy*, No. 215CV01122DCNMGB, 2017 WL 9471790, at *11 (D.S.C. July 21, 2017), *report and recommendation adopted sub nom.*, 2017 WL 4296724 (D.S.C. Sept. 27, 2017) ("As a matter of law, a Plaintiff's request for 'an alternate worksite or different supervisory relationships' because of job-related stress is not reasonable."); *Jordan v. Donahoe*, 2013 WL 3893532, at *10 (E.D. Va. July 26, 2013) ("[I]t is unreasonable as a matter of law for an employee to [request] their being transferred away from a particular supervisor.").  *See also Wernick v. Fed. Rsrv. Bank of New York*, 91 F.3d 379, 384 (2d Cir. 1996) (holding that "failing to assign [the plaintiff] to work under a different supervisor" was not actionable failure to provide reasonable accommodation).

Defendant does not challenge that she had notice of Plaintiff's disability; rather, Defendant contends that Plaintiff was not qualified due to incapacitation and that her requested accommodations were not reasonable.  (ECF No. 88-1 at p. 33–39.)  Plaintiff identifies three purported reasonable accommodation requests that she made to Defendant: the April 29, 2013,

request for reassignment to Ms. Lyle and Mr. Keck, the May 2, 2013, request for reassignment to Mr. Glenn, and the October 8, 2013, request for reassignment.[11]   (ECF No. 85 at p. 14–15.) Following the trend of other courts in this circuit, this court concludes that Plaintiff's accommodation requests for reassignment to a different supervisor were *per se* unreasonable, because a defendant is not required to "provide an employee with a different supervisor as an accommodation." *See Stewart*, 2020 WL 1907471, at *13, *supra*.  As Plaintiff has no other timely, exhausted accommodation requests to sustain her claim, there is no genuine dispute of material fact that Plaintiff has failed to demonstrate a claim for failure to accommodate, and Defendant is entitled to judgment as a matter of law.

### c.   Count III: Interference in Violation of the Rehabilitation Act

While both parties make cursory references to Plaintiff's interference claim in their motions papers, neither party sets forth substantive legal argument on the matter.  Plaintiff fails to cite any legal authority in support of her interference claim – resting instead on nearly 20 pages of factual allegations.  (ECF No. 85 at p. 18–37.)  For her part, Defendant seems to argue that Plaintiff's entire interference claim is barred because she failed to exhaust her administrative remedies, which the court has already rejected, but otherwise merely lumps the interference claim in with her argument as to the disability discrimination and retaliation claims.  This is insufficient and unpersuasive.  *See Menoken v. Dhillon*, 975 F.3d 1, 9–10 (D.C. Cir. 2020) ("The [Rehabilitation Act's] text and structure reinforce that retaliation and interference are distinct protections. It would unnecessarily render section 12203(b) surplusage if we were to treat it as

---

[11] Plaintiff's Motion makes a cursory reference to a July 11, 2013 formal EEO complaint, but does not provide any record of the purported complaint beyond her statement.  (ECF No. 85 at p. 23.)  It is thus unclear to the court if another formal EEO complaint was made beyond those already identified.  However, regardless of whether Plaintiff filed an additional EEO complaint that requested a reasonable accommodation on July 11, 2013, it does not change the court's analysis, as Plaintiff admits her request was for reassignment to another supervisor. *Id.* at 23–24.

nothing more than another prohibition on retaliation."). *See also Kelly v. Town of Abingdon, Virginia*, 90 F.4th 158, 171–72 (4th Cir. 2024) (noting that the Fourth Circuit has not yet interpreted the interference provision under the ADA and using, but not adopting, a Seventh Circuit framework to analyze the claim). Accordingly, neither party is entitled to judgment as a matter of law on Plaintiff's interference claim.

d. <u>Count IV: Retaliation in Violation of the Rehabilitation Act</u>

To establish a *prima facie* case of retaliation under the Rehabilitation Act, Plaintiff must show: "(1) she engaged in a protected activity; (2) her employer acted adversely against her; and (3) her protected activity was causally connected to her employer's adverse action." *Smith v. CSRA*, 12 F.4th 396, 416 (4th Cir. 2021) (citing *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001)). Like a disability discrimination claim, "to prevail on a claim of retaliation, a plaintiff must either offer sufficient direct and indirect evidence of retaliation, or proceed under a burden-shifting method." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 577 (4th Cir. 2015) (quoting *Rhoads*, 257 F.3d at 391). *See Staley v. Gruenberg*, 575 F. App'x 153, 155 (4th Cir. 2014) (discussing the "but for" causation standard in retaliation claims under the ADA and the Rehabilitation Act). "After a prima facie case is made, the burden shifts to the employer to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions." *CSRA*, 12 F.4th at 416 (citations omitted). "If the employer makes this showing, the plaintiff must demonstrate that the proffered reason is pretext for retaliation." *Id.* (citations omitted). Plaintiff bears the ultimate burden to prove retaliation. *Id.*

While an adverse employment action is generally one that adversely affects the terms, conditions, or benefits of employment, "the Fourth Circuit explained that an 'adverse *employment* action' is not the standard in a retaliation case." *Gaines v. Baltimore Police Dep't*, 657 F. Supp.

3d 708, 743 (D. Md. 2023) (citing *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 327 (4th Cir. 2018)).  "[T]he adverse action 'need not be employment or workplace-related in order to sustain a retaliation claim.'"  *Id.* (quoting *Strothers*, 895 F.3d at 327).  Plaintiff need not show that the alleged retaliatory actions affected the terms and conditions of her employment, but she still must allege that the actions at issue were "materially adverse—such that they might have dissuaded a reasonable [person] from engaging in protected activity."  *Strothers*, 895 F.3d at 327 (citations omitted).  The "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61 (2006). *See Jennings v. Frostburg State Univ.*, No. CV ELH-21-656, 2023 WL 4567976, at *23 (D. Md. June 27, 2023) (same).  "[R]etaliatory adverse actions must cause significant harm to be actionable." *Israelitt v. Enter. Servs. LLC*, 78 F.4th 647, 655 (4th Cir. 2023).  The materially adverse standard seeks to separate "minor harms from those that threaten to chill employees from opposing unlawful discrimination.  And, a retaliation claim is assessed against the perspective of a reasonable employee to void the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Gaines*, 657 F. Supp. 3d at 744 (quoting *Laurent-Workman v. Wormuth*, 54 F.4th 201, 213–14 (4th Cir. 2022)) (cleaned up).

Plaintiff's Motion identifies the following claims to demonstrate Defendant's adverse actions against her:[12] Ms. Monger's critical comments in Plaintiff's FY13 Annual Appraisal; increased surveillance by Ms. Monger; ATEC's deactivation of Plaintiff's badge, building, and network access while she was on leave; Ms. Monger's email to Ms. Weaver calling Plaintiff a "lying bitch"; delay in Plaintiff's VLTP application approval; Ms. Monger's inaccurate statements

---

[12] Plaintiff's Response in Opposition to Defendant's Cross Motion for Summary Judgment asserts for the first time that she was retaliated against when Defendant "stop[ped] a temporary detail to another position under Mr. Dave Greene."  (ECF No. 94-1 at p. 2.)  That is the only reference Plaintiff makes to this purported adverse action.

about Plaintiff to OWCP; Ms. Monger's email to Ms. Weaver asking if they could have Plaintiff's

former employer take her back; scrutiny from Ms. Monger because of Plaintiff's participation in

the RDECOM EEO investigation; Mr. Glenn's failure to provide a statement to OWCP about the

April 29, 2013, incident until 2014; and degrading comments[13] by Ms. Monger about Plaintiff.[14]

      The court finds that the following alleged "adverse actions" are not materially adverse and

that there is no genuine dispute of material fact that they did not result in significant harm to

Plaintiff: Ms. Monger's critical comments in Plaintiff's FY13 Annual Appraisal; Ms. Monger's

increased surveillance; deactivation of Plaintiff's badge, building, and network access while she

was on leave; scrutiny by Ms. Monger because of Plaintiff's participation in the RDECOM EEO

investigation; purported "degrading comments" about Plaintiff; and a three business day response

time to approve Plaintiff for VLTP. None of these actions resulted in "significant harm" to

Plaintiff; indeed, some of the purported adverse actions—the increased surveillance and the

degrading comments—were not even known to Plaintiff until discovery in this action. *See*

*Israelitt*, 78 F.4th at 655, *supra*. Further, the purported critical comments in Plaintiff's FY13

Annual Appraisal did not result in any significant harm to Plaintiff; Plaintiff has not identified any

resulting consequence or threat of discipline. *See Barnes v. Charles Cnty. Pub. Sch.*, 747 F. App'x

115, 119 (4th Cir. 2018) (concluding that a warning letter of possible future discipline could be an

adverse action). Similarly, the conclusory allegation that Plaintiff's June 2012 EEO activity

resulted in scrutiny from Ms. Monger is vague and does not identify any actual harm that resulted

beyond Ms. Monger's alleged annoyance. Finally, while allegation that an employer blocked

---

[13] In this category, Plaintiff also appears to include statements Ms. Monger made via email to other ATEC administrators regarding her safety concerns about Plaintiff's behavior. (ECF No. 85 at p. 39–40.) Plaintiff fails to allege these statements resulted in harm to her.

[14] As explained *in* Section IV.B.1 and Section IV.B.2, *supra,* Plaintiff's allegations related to her termination are subject to the Settlement Agreement; therefore, the court declines to consider them.

access to additional career opportunities may constitute an adverse action, it is unclear how that is the case here.  Plaintiff states Ms. Monger wanted to convince Plaintiff's previous employer to rehire her, but makes no representation as to how, if at all, this impaired Plaintiff's career opportunities.  (ECF No. 85 at p. 32–33.)

Plaintiff's remaining allegations[15]—Defendant's actions with respect to Plaintiff's OWCP application—require further analysis.  Defendant asserts that Plaintiff's attack is merely a collateral attack on the workers compensation process, and that Plaintiff provides no evidence that Ms. Monger's statement affected her employment status.  Defendant applies a higher burden than does the law.  "[T]he adverse action 'need not be employment or workplace-related in order to sustain a retaliation claim.'"  *See Gaines*, 657 F. Supp. 3d at 743, *supra*.  Instead, the action must be materially adverse such that it would dissuade a reasonable person from engaging in protected activity and caused harm.  *See Strothers*, 895 F.3d at 327, *supra*.

Even under the applicable standard, Plaintiff fails to demonstrate that Ms. Monger's statements to OWCP or Mr. Glenn's failure to provide a statement to OWCP until February of 2014 constitutes adverse employment action.  This is evident by the OWCP's stated rationale for its finding: "The reason for the decision [denying OWCP benefits] was that the evidence was insufficient to establish that a medical condition arose during the course of [Plaintiff's] employment and within the scope of compensable work factors."  (ECF No. 88-18 at p. 3.)  The denial was not related to Ms. Monger's purported critical comments of Plaintiff's performance; Plaintiff fails to offer any evidence that the critical comments resulted in the harm she alleges.  Neither is Mr. Glenn's delay an adverse action.  No evidence suggests Mr. Glenn's delay affected

---

[15] As set forth in Section IV.B.3(b), *supra*, Plaintiff's request for reassignment to another supervisor was not a reasonable accommodation as a matter of law; therefore, denial of this request is not an adverse action.  Moreover, denial of an accommodation request, without more, cannot sustain a retaliation claim.

the OWCP decision; the OWCP decision was the same even with Mr. Glenn's statement, which acknowledged the incident of April 29, 2013.  (ECF Nos. 88-7, 88-18.)  Accordingly, no genuine disputes of material fact exist and Defendant is entitled to judgment as a matter of law on Plaintiff's retaliation claim.

## V.  CONCLUSION

For the reasons set forth herein, by separate order, Plaintiff's Motion for Reconsideration (ECF No. 95) will be DENIED; Plaintiff's Amended Motion for Summary Judgment (ECF No. 85) will be DENIED; and Defendant's Cross Motion for Summary Judgment (ECF No. 88) will be GRANTED IN PART AND DENIED IN PART.


/S/

March 8, 2024                                          _____
                                                      Julie R. Rubin
                                                      United States District Judge

31